Dale L. ROLLINGS, Trustee of the Edward L. and Mary Lou Harris Charitable Remainder Annuity Trust, Respondent,

v.

Scott SHIPMAN, Assessor, St. Charles County, Missouri, Appellant.

No. ED 95275.

Missouri Court of Appeals, Eastern District, Division Five.

May 24, 2011.

Charissa L. Mayes, Assistant County Counselor, St. Charles, MO, for appellant.

John T. Shaw, Jonesburg, MO, for respondent.

PATRICIA L. COHEN, Judge.

### Introduction

St. Charles County Assessor, Scott Shipman (the Assessor) appeals from the judgment of the Circuit Court of St. Charles County reversing the decision of the State Tax Commission of Missouri (the Commission). Dale Rollings (the Trustee) contends that the Commission's decision to assess an *ad valorem* tax on real property located in Wentzville, Missouri (the Property) is arbitrary, capricious, and unreasonable because the Property qualifies for a tax exemption under Mo.Rev.Stat. § 137.100(5) (2000).[1] We affirm the trial court's judgment.

### Background

Prior to October 2004, Wentzville R–IV School District (the District) leased the Property from Edward and Mary Lou Harris. The District housed its administrative offices in a commercial building located on the Property.

In October 2004, the District approached the Harrises about the possibility of purchasing the Property. The Harrises agreed, and the parties negotiated a purchase price of $1,200,000. The District,

---

1. Although Assessor filed the appeal, Trustee remains the appellant pursuant to Rule 84.05(e).

however, had difficulty completing the sale because it lacked sufficient funds to complete the purchase without obtaining financing through a bond issue. Additionally, under the Missouri Constitution, the District could not purchase the Property through an installment-sale contract on a long-term note.[2]

In light of the District's difficulty financing the purchase, the parties agreed to a transaction where the District would lease the Property for ten years and, at end of the lease period, the District would receive title to the Property. To facilitate the transaction, the District and the Harrises entered into a new lease (the Lease) with monthly payments of $13,322 for ten years, equivalent to the agreed-upon $1,200,000 purchase price at six percent interest.

As part of the transaction, the Harrises also created an irrevocable Charitable Remainder Annuity Trust (the Trust), with a sole asset, the Property.[3] The Harrises assigned the Lease to the Trust. The Trust has a term of ten years ending in 2015. The Trust further provided that during its ten-year term, the Trustee shall pay the Harrises fixed annuity payments equal to ten percent of the market value of the trust assets. At the end of the ten-year term, the Trustee is required to distribute to the District all trust assets, including the Property and any funds received in excess of the Trust's annuity payment.

Following the creation of the Trust, the District began paying its $13,322 monthly lease payment directly to the Trust, which the Trustee used to pay the Trust's annuity payments to the Harrises. As of 2007,

the District used the Property exclusively for school purposes.

On August 27, 2007, the Trustee applied to St. Charles County for a tax exemption on the Property under Section 137.100(5) for the 2007 tax year. The Board of Equalization denied the application, and the Trustee filed an appeal with the Commission. The Commission assigned a hearing officer to hear the case, and, after a full evidentiary hearing, the officer set aside the decision of the Board of Equalization and ordered the St. Charles county clerk to enter the Property on the list of exempt property for 2007 and 2008. In response, the Assessor filed an application for review before the full Commission. The Commission reversed the hearing officer's decision, determining that the Property did not qualify for an exemption under Section 137.100(5). The Commission ordered St. Charles County to "put [the Property] on the tax books ... for tax years 2007 and 2008." The Trustee filed an appeal from the Commission's decision in the St. Charles County Circuit Court. The trial court reversed the Commission's decision, finding that the Property met the requirements under Section 137.100(5) for exemption and that the Commission's decision was unsupported by competent and substantial evidence upon the whole record and was arbitrary, capricious, and unreasonable. This appeal follows.

### Standard of Review

 On appeal, we review the underlying decision of the administrative agency, in this case the Commission, and not the judgment of the trial court. *Shipman v.*

---

2. *See* Mo. Const. Art. VI, § 26(a) (prohibiting political incorporations, including school districts, from incurring debt greater than income and revenues received in the current year plus any unencumbered balances from previous years without a popular vote).

3. *See* Section 664(d)(1) of the Internal Revenue Code of 1986, as amended (26 U.S.C. § 664(d)(1) (2000) (defining Charitable Remainder Annuity Trusts)).

*DNS Elec. Materials, Inc.,* 267 S.W.3d 751, 757 (Mo.App. E.D.2008). We are limited to a determination of whether the Commission's decision is supported by competent and substantial evidence upon the whole record or whether it was arbitrary, capricious, unreasonable, unlawful, or in excess of the Commission's jurisdiction. Section 536.140.2; *Rescue v. Christmas,* 298 S.W.3d 566, 568 (Mo.App. W.D. 2009). When the Commission's decision is based on its interpretation and application of the law, we review its conclusions of law *de novo. Christmas,* 298 S.W.3d at 568. Because the Commission reached its decision by construing Section 137.100(5), we review its determination *de novo. See Shipman,* 267 S.W.3d at 758.

### Discussion

The Trustee contends that the Commission's decision is arbitrary, capricious, and unreasonable because the Commission applied improper legal standards and the Property meets all the requirements for a tax exemption under Section 137.100(5). Specifically, the Trustee asserts that the Property is exempt because it meets the three-part test established by the Supreme Court in *Franciscan Tertiary Province of Missouri, Inc. v. State Tax Commission,* 566 S.W.2d 213 (Mo. banc.1978). In response, the Assessor argues that the Commission applied the proper legal standards and correctly determined that the Property did not qualify for an exemption.

■ In determining whether the Property is eligible for exemption, we are mindful that "each tax exemption case is peculiarly one which must be decided upon its own facts, turning upon the particular record presented." *St. John's Mercy Hospital v. Leachman,* 552 S.W.2d 723, 725 (Mo. banc 1977). Additionally, taxation of property is the rule, and exemption from taxation is the exception. *United Cerebral Palsy Ass'n of Greater Kansas City v. Ross,* 789 S.W.2d 798, 799 (Mo. banc 1990). Accordingly, "statutes granting exemptions from taxation are strictly, but reasonably, construed against the party claiming the exemption." *Id.* The burden is on the property owner to prove that his or her property is exempt from taxation. *Id.*

■ Section 137.100(5) exempts from taxation "[a]ll property, real and personal, actually and regularly used exclusively for religious worship, for schools and colleges, or for purposes purely charitable and not held for private or corporate profit, ..." Section 137.100(5). In *Franciscan,* the Court set forth a three-part test for determining whether property is exempt from taxation under Section 137.100(5). *Ross,* 789 S.W.2d at 800 (quoting *Franciscan,* 566 S.W.2d 213). For property to qualify for an exemption:

(1) it must be actually and regularly used exclusively for purposes purely charitable as "charity" is defined in *Salvation Army v. Hoehn,* 354 Mo. 107, 114, 115, 188 S.W.2d 826, 830 (1945); (2) it must be owned and operated on a not-for-profit basis; and (3) the dominant use of the property must be for the benefit of an indefinite number of people and must directly or indirectly benefit society generally.

*Barnes Hosp. v. Leggett,* 589 S.W.2d 241, 244 (Mo. banc 1979) (citing *Franciscan,* 566 S.W.2d 213).

■ The first element of the *Franciscan* test requires that the property is actually and regularly used exclusively for purely charitable purposes. *Ross,* 789 S.W.2d at 800 (citing *Franciscan,* 566 S.W.2d at 224). The Court in *Salvation Army* defined charity, in part, as a "gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, ... by bringing their hearts un-

der the *influence of education* ...." 188 S.W.2d at 830 *In re Rahn's Estate*, 316 Mo. 492, 291 S.W. 120, 128 (1926) (emphasis added). Additionally, Section 137.100(5) specifically exempts property used exclusively for "schools and colleges," and the record shows that during the tax years in question, 2007 and 2008, the District used the Property exclusively for school purposes. Indeed, Matt Brown, Special Assessments Manager for the St. Charles County's Assessor's Office, admitted at the Commission hearing that the "use of a building by a school district [is] an exempt purpose...." The District's use of the Property satisfies *Franciscan*'s first element.

Seemingly challenging whether the Property meets the first element in the *Franciscan* test, the Assessor argues that the Harrises retain an ownership interest in the Property and "[t]here is nothing inherently charitable about selling one's property to a school district...." In essence, the Assessor contends that to meet *Franciscan*'s first element, the Harrises must either transfer the Property's title to the District or donate the Property to the District. The Assessor, however, points to no relevant case law in support of his arguments. Moreover, the Assessor's assertion that the Harrises own the Property is wrong. As further discussed below, the Harrises relinquished their ownership interest in the Property by conveying the Property to the Trust. Additionally, the Court in *Franciscan* emphasized that whether the "use" of property is charitable is not dependent on "[t]he general nature of the owning organization other than that it is not-for-profit...." 566 S.W.2d at 223. More to the point, the first element in *Franciscan* considers the manner of the "use" of the property only.

The second element of the *Franciscan* test requires that the property at issue is "owned and operated on a non-profit basis." 566 S.W.2d at 224. In order words, the property "must be dedicated unconditionally to the charitable activity in such a way that there will be no profit, presently or prospectively, to individuals or corporations." *Id.*

Before determining whether the Property is "owned and operated on a non-profit basis," we consider the parties' dispute over who owns the Property for purposes of determining tax exemption. The Trustee contends that the District is the equitable owner of the Property, and therefore the owner for tax exemption purposes. The Assessor asserts that "who or what owns" the Property is the "crux" of this controversy, and "because the property is held in [the Harrises'] trust ... [t]he analysis must focus squarely on Mr. and Mrs. Harris...." The Assessor concedes that "[t]he [P]roperty will be exempt if and when the [D]istrict owns it."

The Trustee's contention that the equitable owner of property is the owner for tax exemption purposes is consistent with decisions of our Supreme Court. The Court has held that for taxation purposes, the term "ownership" does not have a fixed, definite meaning. *Thompson–Stearns–Roger v. Schaffner*, 489 S.W.2d 207, 215 (Mo.1973), *overruled on other grounds by Olin Corp. v. Dir. Of Revenue*, 945 S.W.2d 442, 443–44 (Mo. banc 1997). Furthermore, the Court has noted that often, the word "owner" is "used to describe one who has dominion or control over a thing, the title to which is in another." *Id.* (quoting Black's New Dictionary (Rev. 4th Ed.)). Finally, the Court has held that "the word 'owned' in an exemption statute is generally construed to comprehend an equitable as well as a legal ownership." *State ex rel. City of St. Louis v. Baumann*, 348 Mo. 164, 153 S.W.2d 31,

35 (1941) (quoting Cooley on Taxation (1924) § 667).

In *Baumann*, the Court determined that the City of St. Louis, as the equitable owner of real property, was exempt from taxation even though legal title was vested in a private party. The City purchased a parcel of property at a tax sale and although it had a certificate of purchase, the City had not received the deed to the property. *Id.* at 33. The City sought a tax exemption under the constitutional provision providing that "all of the property 'real and personal, of the State, counties and other municipal corporations, and cemeteries, shall be exempt from taxation.'" *Id.* at 33–34 (citing Mo. Const. Art. X § 6; § 10937, R.S.1939; Mo.St.Ann. § 9743, p. 7863). The Court framed the issue on appeal as "whether the City is now such an owner of the land as is contemplated by the exemption provision of the Constitution." *Id.* at 34. The Court determined that the City was entitled to the deed upon presentation of the certificate of purchase to the tax collector. *Id.* The Court stated that "[a]n equitable title has been described as the right in the party to whom it belongs to have the legal title transferred to him upon the performance of specified conditions." *Id.* at 35. The Court held that "[t]herefore, the City is now vested with the equitable title to the land and the land is not subject to taxes." *Id.* Finally, the Court reasoned that "public property [is not] taxable because the naked legal title is in a private person." *Id.* .

The Court's holding in *Baumann* that the holder of equitable title may be considered the owner of property for tax exemption purposes is in accord with numerous other jurisdictions. *See Harris County Appraisal Dist. v. Se. Tex. Hous. Fin. Corp.*, 991 S.W.2d 18, 23 (Tex.App.1998) ("Where a tax exempt entity holds equitable title to property, the property is tax exempt."); *Leon County Educ. Facilities Auth. v. Hartsfield*, 698 So.2d 526, 528 (Fla.1997) ("The concept of equitable ownership in ad valorem taxation has long been a part of Florida law."); *Christian Action Ministry v. Dep't of Local Gov't Affairs*, 74 Ill.2d 51, 23 Ill.Dec. 87, 383 N.E.2d 958, 964 (1978) ("[E]quitable ownership of property, used exclusively for charitable purposes, by a charitable organization is readily accommodated by [charitable tax-exemption statute]."); 71 Am. Jur.2d State and Local Taxation § 152 (2011) ("[T]he equitable holder of real property, rather than the holder of the bare legal title, is subject to taxation."); *see also First Union National Bank of Florida v. Ford*, 636 So.2d 523 (Fla.Dist. Ct.App.1993); *Mayhew Tech Ctr., Phase II v. County of Sacramento*, 4 Cal.App.4th 497, 507, 5 Cal.Rptr.2d 702 (Cal.App. 3 Dist.1992); *Airport Bldg. Corp. v. Linn County Assessor*, 406 N.W.2d 806, 811 (Iowa Ct.App.1987); *State ex rel. Wis. Univ. Bldg. Corp. v. Bareis*, 257 Wis. 497, 44 N.W.2d 259, 263 (1950); *Village of Hibbing v. Comm'r of Taxation*, 217 Minn. 528, 14 N.W.2d 923, 926 (1944); *Cf. People ex rel. Wilson v. St. Mary's Roman Catholic Hosp. of Centralia*, 306 Ill. 174, 178, 137 N.E. 865 (Ill.1922) (holding that property owned by an otherwise exempt church did not qualify for exemption when a nonexempt hospital held equitable title).

We find *First Union National Bank of Florida v. Ford*, 636 So.2d 523 (Fla.Dist. Ct.App.1993) particularly instructive here. In *Ford*, a County and a Bank entered into a "lease-trust arrangement" to facilitate the County's construction of a County office building. *Id.* at 523–24. The real property where the building was located was held in a trust. *Id.* at 524. The Bank held the property's legal title and acted as trustee for the investors who had purchased certificates of participation to fi-

nance the County's construction. *Id.* The Bank and the County entered into a lease, requiring that the County occupy the property solely for County governmental purposes, maintain the building and property, provide insurance, and pay any due and payable taxes. *Id.* The Bank distributed the County's lease payments as principal and interest payments to the investors twice annually. *Id.* When the lease expired and the investors were repaid in full, the Bank was to convey legal title to the property to the County. *Id.* However, the lease required the Bank to sell or relet the property if the County failed to pay rent or comply with its lease obligations. *Id.*

After reviewing the terms of the lease and the trust, the court in *Ford* determined that "the County ha[d] retained sufficient rights and duties regarding the realty and its improvements, to make it the equitable owner." *Id.* As the "equitable owner," the County was the "owner" as contemplated by the statute exempting "[a]ll property owned by an exempt entity and used exclusively for exempt purposes...." *Id.* at 523 (quoting Fla. Stat. § 196.192(1)). Accordingly, the property was exempt from taxation while the Bank held legal title and the County held equitable title. *Id.* at 525.

We conclude that the District is the equitable owner of the Property. The Lease's terms provide that the District has sole possession of the Property for its classroom and office facilities and the right to sublease office space, as well as, remodel and modify the office building without prior landlord approval. The Lease also provides that the District has the sole obligation to maintain the Property and to obtain property, casualty, and liability insurance for the Property. Finally, the Lease grants the District the annual right to terminate the Lease, first right of refusal to purchase the Property, and an option to purchase the Property at the end of the Lease term.

The Trust provides that when the Trust terminates, the Trustee shall distribute to the District all trust property, including legal title to the Property and any and all funds exceeding the Trust's annuity payment to the Harrises. During the Trust's term, the Trustee holds legal title to the Property and the District, as the charitable beneficiary of the Trust, holds equitable title to the Property. *See Mercantile Trust Co., N.A. v. Hardie,* 39 S.W.3d 907, 913 (Mo.App. S.D.2001). Furthermore, the Trust states that the "[T]rust is irrevocable and may not be altered or amended in any respect unless specifically authorized by this agreement."

Challenging the scope of the District's rights under the Lease and Trust, the Assessor claims that the District is not guaranteed legal title to the Property when the Trust terminates. First, the Assessor asserts that, under the Trust, the Harrises may change the remainder beneficiary to a different qualifying charitable organization. The Assessor, however, points to no provision of the Trust permitting the Harrises to alter the remainder beneficiaries, and, in fact, the Trust provides only that the Trustee may change or substitute the remainder beneficiary if the District is not a "Qualifying Organization". The Assessor does not argue, and there is nothing in the record to suggest, that the District is not a Qualifying Organization.[4]

---

4. A "Qualifying Organization" is defined by the Trust as "an organization of a type described in each of Sections 170(b)(1)(A), 170(c), 2055(a) and 2522(a) of the [Internal Revenue] Code and the Regulations thereunder." The types of organizations described in Section 170(c)(2) include "[a] corporation, trust, or community chest, fund, or foundation-**(A)** created or organized ... under the law of ... any State, ... **(B)** organized and

Second, the Assessor contends that, under the Lease, the Trustee may sell the Property prior to the expiration of the Trust, and the District would receive only the cash generated from the sale. The Lease, however, grants the District a first right of refusal, precluding the Trustee from selling the Property without first offering the District the opportunity to purchase the Property.[5]

■ In addition to our determination that the District is the equitable owner of the Property, we also conclude that the District owns and operates the Property on a non-profit basis. The District is a public school district operating its administrative offices on the Property. There is no evidence in the record that the District generates or retains a profit from its operations and ownership of the Property.

In support of his contention that the Property is not owned and operated on a non-profit basis, the Assessor contends that the Trustee's distribution of the District's lease payments to the Harrises as annuity payments constitutes a profit to an individual. "Whether property is used for profit depends on the intent of the owner in using the property." *Victory Christian Church v. Dept. of Revenue*, 264 Ill.App.3d 919, 201 Ill.Dec. 874, 637 N.E.2d 463, 465 (Ill.App. 1 Dist.1994). The record is clear that the District, the equitable owner of the Property, intends to own and use the Property for its public schools, not to yield

a profit to the Harrises. Moreover, the mere presence of a profit does not disqualify property for tax exemption under Section 137.100(5) if the profit is incidental to and not the "primary goal of the project" and such gains are devoted to the charitable objective. *Bethesda Barclay House v. Ciarleglio*, 88 S.W.3d 85, 93 (Mo.App. E.D. 2002) (citing *Franciscan*, 566 S.W.2d at 224). Even if the District's lease payments distributed to the Harrises as annuity payments constitute a profit, such profits are incidental to the District's primary goal of purchasing the Property and using the Property exclusively for school purposes.

To further support his position that the District's lease payments constitute a profit, the Assessor relies primarily on *Hammer v. Macgurn*, 187 Mo. 238, 86 S.W. 138 (1905). In *Macgurn*, the fee owners of real property leased the property to the St. Louis public schools. *Id.* at 139. The Court held that the property was not exempt from property taxes under a statute exempting "lots in incorporated cities, * * * when the same are used exclusively for religious worship, for schools. . . ." *Id.* (quoting Section 7504, Rev. St. (1889)). The Court reasoned that because the owner "applies the rents derived from the land to his own personal advantage, he contributes nothing to the public or to charity, he loses nothing by the use. . . ." *Id.*

operated exclusively for . . . educational purposes . . . **(C)** no part of the net earnings of which inures to the benefit of any private shareholder or individual; and **(D)** which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, . . . ." 26 U.S.C. 170(c)(2) (2010). We find no basis to conclude that the District, operating a public school, would not constitute a Qualified Organization.

5. The Assessor also suggests that if the District does not use or own the Property in the

future, there is no guarantee that another Qualifying Organization would use the Property for charitable purposes. As this court has previously recognized, "there is no requirement in [Section 137.100(5)] that the owner prove that all conceivable future uses will be charitable." *Abbott Ambulance, Inc. v. Leggett*, 926 S.W.2d 92, 96 (Mo.App. E.D. 1996). The record demonstrates that the District used the Property for exempt school purposes during the 2007 and 2008 tax years at issue in this appeal.

*Macgurn* is distinguishable from the instant case. Initially, we note that the decision in *Macgurn* predated *Baumann,* and the Court did not consider the issue of equitable ownership. More importantly, unlike the owners in *Macgurn* who merely leased the property to the school district and retained their fee interest, the Harrises conveyed the Property to an irrevocable trust that provides no mechanism for the Harrises to reacquire ownership in the Property. Thus, in contrast to *Macgurn,* the owner of the Property for tax exemption purposes, the District, is not profiting from its ownership.

 The third element of the *Franciscan* test is that "the dominant use of the property must be for the benefit of an indefinite number of people and must directly or indirectly benefit society generally." *Barnes Hosp.,* 589 S.W.2d at 244 (citing *Franciscan,* 566 S.W.2d 213). The parties do not dispute that the District's use of the Property benefits the individual students who attend the District's schools, and that the public education system benefits society generally. *See Franciscan,* 566 S.W.2d at 224–25 (listing comparable humanitarian activities that benefit an indefinite number of people and directly or indirectly benefit society generally).

Nevertheless, the Assessor contends that the Property does not meet *Franciscan*'s third element because the Trustee failed to demonstrate "how selling its property to the school district has made the humanitarian activities of the [D]istrict taking place on the premises any more likely or any less costly to the citizenry. It has failed to show that it has provided any direct or indirect benefit to society." Again, the Assessor improperly focuses on the Harrises' sale of the Property rather than the District's use of the Property. The third element of *Franciscan* simply requires that the "dominant use" of the property benefits society. The Assessor does not dispute that the District's use of the Property for public school purposes benefits society.

Having determined that the Property meets the three-part *Franciscan* test, we reverse the Commission's decision denying the Property an exemption from *ad valorem* real estate taxes during 2007 and 2008. Accordingly, the County Clerk of St. Charles County shall enter the Property on the list of exempt property for tax years 2007 and 2008.

### Conclusion

The trial court's judgment reversing the Commission is affirmed.

GARY M. GAERTNER, JR., P.J., and MARY K. HOFF, J., concur.